May it please the court, I'm Steve Porter from Madison, Wisconsin, and one of my clients, Jesse Miller, is present. As you may be aware, unfortunately, Stephanie Miller passed away last month, and Jesse is her son, and Jesse is representing the Harlan LLC, and probably will eventually be the personal representative standing in for her. What is the status of that? As you know, we've entered the order. Yes. Regarding that temporarily. The court ordered that we update you within 30 days, which I think is still... Oh, no, I know we're in the 30 days, but I just wondered if you had an update. Yeah, I'm told by Jesse Miller that probate has not been initiated yet. I guess there's some complications because they own a lot of property, but he's expecting that it will be shortly, and he is designated in the will as the personal representative. So I assume, hopefully within 30 days, but certainly not too long after that, he will step in for Stephanie Miller. All right. Well, you'll inform the court when that occurs, obviously. I certainly will. All right. Thank you, Mr. Porter. Sure. I think the best way to start this out is with a quote from Esmail versus McRane, that if the power of government is brought to bear on a harmless individual, merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court. When Stephanie Miller came to me and explained the facts of this case to me, I wasn't the attorney at the trial court level, it seemed to me to fit that description, as well as the description of the facts in Swanson versus Shattuck, which also happened to be my case. And I think that the important thing to keep in mind in this case is that this really isn't a case about zoning. It's not a case about a zoning decision by a planning commission. It's a case about harassment from city officials that we believe, if the case had been allowed to go forward on the class of one claim, would have shown that due to the instigation of the Miller's neighbor, who was a former mayor of Monona and who had spent some time trying to negotiate with the Millers about possibly expanding and doing a joint project, as soon as that failed, what happened was this former mayor, Richard Lickfeld, went on a mission, really, to interfere with the Millers, the progress of their application, and we believe was successful in persuading the pertinent city officials, who are the defendants in this case, to harass the Millers project in a number of different ways that are pointed out in the complaint. And that includes issuing four citations for building code violations, public nuisance, commencing demolition without a permit, failure to raise a garage, and things like that. They were really, all but one was totally frivolous, and the one that did have some merit and was upheld by the municipal court was pursued, really, completely against the standard procedure of the building code enforcer, which was to attempt voluntary compliance through communication before bringing citations. The evidence is that the building code enforcement person, defendant Nedham, had barely had any contact with the property at all before he was immediately citing the Millers for  Mr. Porter, before you get into the merits, do you want to speak at all to jurisdiction? I guess the argument that we made in our brief is that we appealed from the entire judgment and that that judgment pertained to all the defendants in this case. I was retained at the point in time to bring the motion for a new trial. I brought that motion. The only defendant remaining in the case on the caption at that point was Mark Davis, who is no longer in the appeal. When that motion was denied, we appealed, and we appealed styling the case with the caption that was the only one that was extant at that moment in the district court, but made it clear in our notice of appeal and in the docketing statement that we were appealing from the entire judgment, which included all the defendants and which the court of appeals understood when it styled the case with the et al. designation and gave notice to all of the parties. We believe that there is jurisdiction based on that, that there was full notice to all parties, that nobody was deceived, that all the parties appeared and that they filed their briefs in this case. Nobody was prejudiced by any of the caption of the case. Of course, the cases that I cite and even the cases that were cited by the defendants indicate that the policy is to be quite liberal with these designations. Back to the facts of the case. Before you get into that, what discovery do you anticipate would be taken if the case went back? Because it seems to me the focus had to do with sex, the sex discrimination allegations. What additional discovery would you make? The additional discovery would be primarily related to the influence of Richard Lickfeldt upon Mayor Call, Planning Commissioner Kackelmeyer, the City Attorney, and then Mr. Netto. What we know is that, as alleged in the complaint, shortly after the deal or the negotiations fell through between my client and Lickfeldt, there were communications in progress between Mayor Call and Kackelmeyer and Lickfeldt. Lickfeldt, in the municipal court proceedings, the evidence that came out during that trial indicated that Lickfeldt was the one who suggested or insisted that the municipality, that Monona, order the fence to be built, which was then nine months later ordered to be torn down. We believe that discovery will indicate that he was the primary one filing the complaints that resulted in the entirely unreasonable raise order for the garage and the disposition of the pier and the boat hoist, all of which were perfectly functional, the removal of the second driveway. The evidence alleged in the complaint is that Lickfeldt at least three times went on the property, trespassed on the property to take pictures, which were then used in Planning Commission meetings. We then have Mayor Call shortly after one of these episodes or incursions announcing allegedly to the Planning Commission that this is the worst public nuisance in the city and that we're going to fine them $2,000 a day and we're going after them. The other thing is that, frankly, my client Jesse Miller and Stephanie Miller would have testified, had she survived, that during the negotiations when they were still talking about developing the property jointly together, Lickfeldt bragged to them that he could get anything through with these defendants that they owed their job to him. He had appointed them or hired them when he was a mayor and he could get them to do what he wanted. And we believe that with further discovery we'll be able to flesh out that that's what was going on, that all of these citations were malice on the part of the neighbor, the former mayor, Mr. Lickfeldt, to prevent the project from happening. And what we have now, five years later, or almost ten years later, is two vacant lots sitting there. Stephanie Miller had serious heart issues. After three years of the hold she gave up and the property sits there vacant and it can't even be developed. So we would argue that discovery will reveal the fact that Mayor Lickfeldt got what he wanted, which was a nice vacant lot next to his property and not a bustling condominium project. So that would be the animus that we think. When you're looking for sexual animus, you're not looking at that. The discovery, as I understand it, didn't get much into Lickfeldt's role. The municipal court action trial did explore that and we would follow up on that to try to establish that this was a malicious act that was essentially orchestrated by Richard Lickfeldt. And that's really the essence of the case. And I think, as in the Swanson case, we have frivolous ordinance prosecutions in which the municipal court expressly states that the city's position was unreasonable. And we have the only valid one that the district court hung its whole rationale on, the only valid conviction that was upheld was just a technicality that really was punitive in nature because there was nothing to be gained in terms of enforcement or better application of the building codes. It was just punitive. The plaintiffs already had their raise permit by the time they were cited for starting out without one. And as the evidence indicates, the local ordinance actually provided that the remedy for that was to charge twice the application fee rather than citing people for an ordinance. And rather than do that, we believe that Mr. Nedham, probably on instructions from on high maliciously, cited the Millers really after he had really just at first come in contact with the property and the situation. We have the fact that even after all of the building code issues were satisfied and the raising had happened and it had all been cleared by Nedham and by the city, the hold was held in effect for three years. The hold on the application and development project was on hold for three years until the city was satisfied that the Millers were going to pay the citations, which were still in litigation. There hadn't even been any kind of a determination of anything being owed. So, you know, these are the types of really irrational conduct aimed at people who are really, for the first time, trying to develop a piece of property. And you would expect that a municipality like Monono, when you have first-time developers coming to you who have been in the real estate business for a long time, you think they'd give them a little bit of extra concern and extra nurturing, extra flexibility. They did not. And instead they bring a whole plague of enforcement actions on them, build a fence, tear it down. We're going to come out and see if your weeds are too long, just a whole series of things. And then we're going to hold, even once you're in full compliance, we're going to hold all of this up until you pay us $24,000 on frivolous ordinance violations. That, to me, smacks of malice. And I think we're going to find out with discovery what was behind that. And we think it was Richard Lickfeldt. All right. Thank you, Mr. Porter. Mr. Gunther? Good morning. May it please the Court. Let's be clear about one thing, and I'm sure the Court already is, that Mr. Lickfeldt, although a former mayor of the city of Monono, was not a named defendant in this case. Mr. Lickfeldt was not deposed in this case, to the best of my knowledge. Mr. Lickfeldt's animus may or may not be real. We don't know. All we have is appellant's assertions that, in fact, he had some animus. But even if he did, it doesn't have an effect on the basic facts or the process going through in this case. I know counsel would like very much, the appellant's counsel would like very much for you to make this case analogous to Swanson. Well, Swanson, as we know, as this Court knows very well, was the Freddy Krueger of mayors. He was a monster. And this Court essentially found that his conduct was so malicious and his animosity was so strong that the similarly situated comparators weren't actually necessary in making a determination. That's not the case we have here. We have to go on the record. There is none of this conduct. I know that appellant's counsel was not the counsel who was handling this case when it went to the district court on the motion to dismiss. And I know that he did nothing in drafting the complaint. But the complaint, as was originally filed, was so bare boned and so thin as to finding a similarly situated developer or development project that the district court actually made that comment on the thinness. And I think that we have to take a close look at what case is very comparable that's come out of this Court previously to our case. And I think if you're going to be looking at a case for that type of similarity, I would look at LaBella v. Weneka. And I know that members of this panel are acquainted with that case. And in that LaBella case, dismissal at the pleading stage was appropriate, as the Court noted, because appellants like LaBella have failed to allege facts tending to show that they are similarly situated to the alleged comparator. And I'm not going to go over the facts of that case with you. But it was very interesting from the perspective that the LaBella, the Italian restaurant that was owned by LaBella, in fact had a situation where they were in the same building as two of their comparators. And there was a roof fire, and the fire started. And to make a long story short, LaBella used these other two restaurants in that same facility and one other as comparators. And the Court found that, you know, essentially these may be restaurants, true, they're all restaurants, but they're different because they're not similar. And they're not similar in circumstances or conditions. And I think one of the ‑‑ I know the Court knows very well the law on the similarly situated and the issues relative to a class of one. But I think it's important to take a look at the facts of this case as they compare with LaBella. And I think that they're very, very close. You have really no proof at any stage of the proceeding, beginning in the original complaint, that any comparators were really found or even identified by the plaintiffs, now appellants. What we have was we have this Metcalf project that somehow the process of a conspiracy theory links Lechfeldt into. We have that. We only have two comparators that are similarly situated items or elements that are included in that. And one is the size and the other the density. And I think that with those two comparators, excuse me, with those two similar situations as alleged, there really was nothing for the district court to go on. That was it. There was no other basis for the court to look to comparators and find any that had been alleged by the plaintiff appellant to be the same or similar to the situation we had with the Millers project. Now, one thing that is important, though, I think, and I really need to make this point, is that if you look at the Millers pleadings and you look at the first amended complaint, which is the complaint that the court did the original dismissal upon, you'll see that rather than name comparators or similarly situated situations, they went and only named these two very small items that I have previously mentioned, that the Miller project was being compared to a 45 plan unit, which was the Metcalf, which was much larger and that it was on a different size piece of property. But it's important to look at the record in this case to determine the differences, the lack of similarity as related much by the appellant in this case in their brief. First of all, the appellants had demolition issues. Metcalf did not. There's no doubt about that. Appellants had asbestos issues. Metcalf did not. Appellants had property tax issues. Metcalf did not. And I'm taking this all out of appellant's brief. Appellant had property trespass issues. Metcalf did not. The appellant project had municipal fines. Now, I know that they feel that the municipal fining process was all part of a grand conspiracy, but there really is no proof of that. In our Gianoski case, though, didn't we recognize that the frivolous nature of sanctions that are imposed can raise that question of whether there was a discriminatory treatment of a single individual without a comparator? Well, yes, Your Honor, to a certain extent. But I think I have to take a little bit of issue with the comparison with this case. And I'll tell you why. The term frivolous has been used repeatedly by the appellant in this case. There's been no finding anywhere in this case, by a municipal court or otherwise, that any of the actions of the municipality were frivolous. And, in fact, if you look to the summary judgment decision that Judge Conley, the district court judge, rendered, he specifically noted that in regard to the equal protection issue that, as it applied to Ms. Miller because of her sex, that in that particular situation, he could find no discriminatory conduct on the part of the defendants in the case. But isn't the key there that his finding was framed in relation to sexual discrimination? Yes. And so as to other kinds of discrimination that they're alleging, there is a distinction to be drawn there. There is a distinction, but there's also a way we have to look a little closer. Yes, one is dealing with sex and one is dealing with alleged conduct on the part of the government officials. So, therefore, when you look at what the discovery related to, it was viewed or it was done in light of the sex discrimination claim, not necessarily the rest of the case. Well, Your Honor, but if you look at what – To show discriminatory animus. And so if you've got an equal protection class of one claim and you can show discriminatory animus, you don't really need a comparative. Well, Your Honor, if you can show discriminatory animus, as I understand the law, the more, the stronger the discriminatory animus is, the less you have to find a comparator. Right. And I'm looking for the discriminatory animus. And when I brought up the summary judgment decision, I was only bringing it up in this terms. When you have to prove an act of sexual discrimination, you also have to look, do you not, to find if there are comparators. And that was done in the discovery in that case. In fact, the appellants had named Mr. Metcalf as being a male comparator. They also named his project as being a comparator to show that there was discrimination against Ms. Miller based upon her sex as a result of the project itself going forward. Yeah, but Metcalf, the main, he had a 45-unit condo. It was on the same street, close to the same size. There was a difference in the project size. Quite a bit. And his application was made a year and a half before. There was absolutely no resistance to his property. And when you look at the long list of things that happened, I mean, just the long list of things, I'm not going to go through all of them, but, you know, starting in March when the negotiations fell apart, the discussions that Katzmeier had with Litchfield, how they get the demolition permit, saying they needed to get the thing raised and then, you know, saying it didn't. I mean, I'm not going to go through all those various things, but it's really quite extraordinary the number of roadblocks they ran into with this property. Well, if I can address that, Your Honor, I think you're, I'm out of time. All right, thank you. If you take a look at the asbestos issue, would one not want to differentiate their project that's a Miller's project, if they have an asbestos problem? I thought the plaintiffs had resolved that issue, as they indicated. Well, they always had to be told to do it. It wasn't because they voluntarily said, we've got asbestos on this property, let's tear down this garage or let's remove that pier or let's put extra fill in. They always had to be told to do these things. So just like they were told to raise the houses about the fence and then to tear down the fence and all this back and forth, they had to be told that too? Well, they did have to raise the home, Your Honor. I mean, the home was in a dilapidated condition and the house could not, the project couldn't be built with that dilapidated home on the property. I mean, it was, if we take a look at this to accuse the municipality, remember that Kacklemeyer does, you know, he's not in a position with the city. He's the zoning and planning guy. But he had to tell these people to tear the house down. But I thought that the demolition was in progress when the order to raise the houses was given. The demolition was in progress, right? I'm not quite sure. I don't remember that. But I do know that it was done at the impetus of the municipality. And then they were told that they had to erect the fence and they were told it had to be done by 7-29, so it was built 8-8, and then eight months later they were told to take the fence down. All of that does nowhere near, at least in my humble opinion, rise to the level of what we had in a situation like Swanson. I mean, it's just not there. These were government officials acting accordingly, and if they would have done their homework. You know, there is something called due diligence, Your Honor, and when you're looking at formulating a complaint, maybe one should look at all of these aspects and then begin the process before they draft the complaint. None of that was done here because that's the only reason we're here today. We're here on the motion to dismiss. And, you know, I can't beg people in the cases I have representing municipalities to plead things so that I understand what they're saying more fully, and a lot of times they don't. And this is just one of those cases where it was so thin. And remember, this happened at a point in time prior to the summary judgment motion, and the district court judge only had this thin veil to go through when he made his decision. Thank you. Mr. Harvey. Thank you, Your Honor. May it please the court. I represent David Nedham, who was a building inspector for a company called Independent Inspections, which had a contract with the city. And Mr. Nedham only worked for Independent Inspections for a short while, just about a year, from the middle of 2005 through November 2006, when he was eventually let go because he couldn't get a plumbing certificate. So nothing whatsoever to do with this case. And the reason I wanted to speak separately from Mr. Guinta today was just to because the claims against Mr. Nedham, his interaction with the plaintiffs was very sparse. He noticed a problem with the houses in the middle of 2005, but he didn't really do anything about it because the information he had was that they were building on them. And so he didn't come back into the picture even until July 2006, toward the end of July 2006. So then he interacts with them in July 2006 through the time he's let go in November. But even in that time frame, he's just got a handful of interactions with them. So from Mr. Nedham's perspective, since he's still an individual defendant, this is not a case like Swanson, where the parties live next door to each other, they're interacting all the time, they have a lot of time to build up animosity. Mr. Nedham barely interacted with these people, and I think that's why the allegations and the proof against him are so sparse. He just didn't come into contact with them all that much. He issued a couple of citations. One of them was upheld. He served the citation, and then he was let go from the company basically after that. Well, the municipal court found at least two of the citations for the fence and removal of some of the debris were without any legal support. Well, I'm glad you brought that up, Your Honor, because that's one of the issues. Counsel's been labeling these frivolous. But the municipal court decision, which is in the record, I believe at 98-1, if you read that, it doesn't say that they're frivolous citations. Now, he issued a couple of them. One of them was upheld, and since we're on a rational basis, land, that's a key point for Mr. Nedham because he only needed to get one. He didn't have to bat 1,000 on this. He just needed to get one, and he did. But then even if you look at the ones that were dismissed, they're not frivolous, and the decision doesn't say they were frivolous. So one of them, for instance, was the public nuisance as of July 17, 2006. And what the court said was, well, look, the date on the citation is July 17, 2006, and the question is, was the level of debris such that it was a nuisance? And the judge said, you know, they were in the middle of a rehabilitation project and there was certainly debris there. I'm not going to say that that was a public nuisance because that's to be expected at that time. But there could have been a nuisance on other dates before that, just not on the specific date of the citation. So that's really more of a technicality. It's not a, this was a frivolous citation. And the same goes for the other ones. One of the other citations was failure to remove a garage. That comes from Code Section 15-1-83 sub 4, which says all appurtenant structures on the premises no longer useful for the intended use of the premises. Well, from Mr. Nattum's perspective, he comes in, and there's two properties, and they have single-family use houses on them. They are undisputably going to raise them. They're going to try and build one property with this big luxury condo. So he could have reasonably looked at that and said, you know, this garage, which goes with a single-family house, it's no longer for the intended use because the long-term project here is a condo, so you don't need that garage there. You should be raising everything at the same time. And that's why I think the municipal court said they certainly had a temporary intended use where they were going to use the garage. But he could have rationally thought, look, the long-term plan is luxury condos, that's it. And the same thing with the driveway citation. The driveway citation goes to 15-1-83 sub 2, and that says all surfacing on the premises shall be removed unless intended to be used in connection with the proposed use of the premises. Now, again, he could have looked at it and said, well, the proposed use is one big condo project. It's not two single-family use houses, so you rationally only need one driveway going in there. So that's not a frivolous citation either. It's a close call, and sure, we lost on it, or the city attorney lost on it, but it's not that it was frivolous. And the other one was the fill the general grade. And the municipal court specifically said, I'm looking at the evidence here, and I'm not siding with either side. What the problem was is I've got grainy pictures in front of me, and I can't tell if there was actually a problem with the grade. So it's a criminal proceeding, and a tie goes to the defendant. It wasn't that it was a frivolous citation. It was, you know, they won. So the bottom line is the plaintiffs, they had a solid attorney below who represented them zealously. But Mr. Nedham issued a couple of citations. They were all close calls, and he succeeded on one. So this is not anywhere near like Swanson or Gianoski. And I see that my time's up, so we're asking that the district court's decision be affirmed. Thank you, Mr. Harvey. Mr. Porter. Your Honors, the district court's decision on summary judgment was quoted in significant part in the statement of facts in the city of Monona's brief regarding the disposition of the citations at pages 17 and 18 of the district court's decision on the motion for summary judgment. The court quotes the municipal court as saying, the evidence showed that there was a zealous effort to enforce compliance of the building code by the city of Monona against Miller, and that the city of Monona may have exceeded its authority. It is the conclusion of the court that some of the efforts to enforce compliance were unreasonable, in parentheses, e.g., requirement that Miller remove the structurally sound garage, removal of access, in other words, the driveway from the lots, removal of the pier components, including the boat hoist, requirement that a fence be constructed, and the refusal to grant a zoning permit until all outstanding citations were resolved. That was completely in defiance of state law, which the district court found. The municipal court pretty specifically found that three of the four citations were unreasonable, and that's really the foundation of this case. It's a rational basis. Did the government treat my clients arbitrarily, or did they have a rational means to a legitimate state end in mind? And I think that even the municipal court finding, which I'm not prepared to argue whether that should have any preclusive effect or not, definitely determined at the municipal court level, at the level where these ordinances are litigated all the time, that the city was unreasonable and exceeded its authority and violated state law. Thank you, Mr. Porter. Thanks to all counsel. The case is taken under advisement.